UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

YULEIMA MERINO DIAZ.                                        Petitioner

v.                                                         Civil Action No. 4:26-cv-14-RGJ

JASON WOOSLEY, ET AL.,                                     Respondents

\* \* \* \* \*

**TEMPORARY RESTRAINING ORDER**

Yuleima Merino Diaz ("Diaz") moves for an emergency temporary restraining order ("TRO") under Federal Rule of Civil Procedure 65 to enjoin Respondents from removing Diaz to the Democratic Republic of Congo. [DE 18]. Respondents have been put on notice of Petitioners' motion by way of Petitioners' CM/ECF filing but have neither responded nor communicated with the Court requesting an opportunity to be heard on the motion. For the reasons set forth below, the Court **GRANTS** Petitioners' motion for a TRO.

**I.     BACKGROUND**

Yuleima Merino Diaz ("Diaz") is a 39-year-old native and citizen of Colombia. [DE 1 at 4]. She re-entered the United States on October 13, 2023. [*Id.*]. Upon her re-entry, she was arrested and convicted of criminal trespass. [*Id.*]. She was sentenced to 17 days in jail and then promptly transferred to the custody of the Department of Homeland Security ("DHS"). [*Id.*]. Diaz has remained in custody at Grayson County Jail, in the Western District of Kentucky, awaiting removal, since that date.

Throughout her detention, Diaz was placed in withholding only proceedings after an asylum officer found Diaz to have a reasonable fear of persecution or torture if sent back to her

1

home country. [*Id.*]. On August 20, 2024, Diaz was found to be mentally incompetent by an Immigration Judge ("IJ") and her counsel was appointed as her qualified representative and guardian. [*Id.* at 5]. Then, on April 8, 2025, an IJ granted Diaz Withholding of Removal. [*Id.*]. Throughout her detention, Diaz has requested multiple custody reviews and has either received a rejection in English, which she does not speak, or no answer. [*Id.*]. Throughout her time in detention, Diaz has been transferred multiple times between the jurisdiction of the Louisiana Immigration and Customs Enforcement ("ICE") Field Office and Chicago ICE Field Office, typically without her prior knowledge. [*Id.*]. Diaz filed a Petition with this Court on January 12, 2026, while she was detained at Grayson County Jail, asserting a violation of the due process clause for her prolonged detention. [*Id.* at 5-6].

After Diaz was granted her withholding of removal, Respondents attempted to remove Diaz to Mexico. [DE 18 at 68]. Diaz requested a Reasonable Fear Interview, which was denied without notice to counsel. [*Id.*]. After DHS determined that Mexico was no longer a viable option for Diaz, Respondents notified the Court, and Diaz, that she is to be removed "within the next few days" to the Democratic Republic of the Congo ("DRC") "pursuant to the Third Country Removal Agreement." [DE 17 at 64]. Diaz again requested a Reasonable Fear Interview out of being harmed or killed in the DRC. [DE 18 at 68]. Respondents again denied this request. [*Id.*]. In their denial, Respondents stated that "DHS has received assurances from [DRC] that Petitioner's life or freedom will not be threatened." And that because "the Department of State determined that these diplomatic assurances were credible" Diaz may be removed to the DRC without any further notice or hearing. [*Id.*].

After being notified of Diaz's impending removal to DRC, Diaz filed an Emergency Temporary Restraining Order ("TRO") to "return Petitioner to Kentucky," to "not remove

2

Petitioner to DRC, and to follow the procedures outlined in the [applicable] statute[s] and regulations." [DE 18 at 75].

## II.    STANDARD

A TRO is a precursor to a preliminary injunction and an extraordinary judicial remedy governed by Fed. R. Civ. P. 65.  In determining whether to issue such relief, district courts in the Sixth Circuit consider whether:

(1) The movant has a strong likelihood of success on the merits.
(2) The movant would suffer irreparable injury absent a TRO.
(3) Granting the TRO would cause substantial harm to others.
(4) Whether the public interest would be served by granting the TRO.

See *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir.2008). All four factors are not prerequisites, "but are interconnected considerations that must be balanced together." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

First, there is a sufficient likelihood of success when "the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985)). Second, harm from the denial of a TRO in the form a constitutional violation "unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1973). Third, a TRO is appropriate if injunctive relief would not cause substantial harm to others beyond the parties in the dispute. *See Brunner*, 543 F.3d at 361; *e.g., Fed. Nat'l Mortg. Ass'n v. Sunrise Villas, LLC*, No. 2:25-CV-2217, 2025 WL 756036, at *5 (W.D. Tenn. Mar. 10, 2025). Finally, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court need not make findings on each factor if fewer are dispositive of the issue. *In re*

*DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. School Dist. of Ferndale. Mich.*, 577 F.2d 1339, 1352 (6th Cir. 1978)). The party seeking [the temporary restraining order] bears the burden of justifying such relief. *Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 382 (6th Cir. 2014) (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)) (internal quotation marks omitted).

### III.    JURISDICTION

Before the Court can rule upon the merits of the TRO, the Court must first find that it has jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (holding that district courts have jurisdiction only where Congress has provided). Additionally, district courts within the Sixth Circuit do not have jurisdiction to decide claims that arise from an Executive Branch decision to "*execute* a removal order." *Rranxburgaj v. Wolf*, 825 F. App'x 278, 282-83 (6th Cir. 2020). Although the Court "may not review discretionary decisions made by immigration authorities, it may review immigration-related detentions to determine if they comport with the demands of the Constitution." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

In a previous docket entry Respondents stated that since Diaz has a final order of removal 8 U.S.C. § 1252(g) "'strips district courts of jurisdiction over any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter'" [DE 17 at 65 (quoting 8 U.S.C. § 1252(g))]. Therefore, this Court lacks jurisdiction to hear this case.

The Supreme Court has rejected the suggestion that § 1252(g) covers "all claims arising from deportation proceedings" or imposes "a general jurisdictional limitation." *Reno v. American-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999). Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Id.* at 485

4

n.9. Section 1252(g) should be read as a narrow provision, that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (quoting Section 1252(g)).

Therefore, trial courts do, however, have jurisdiction to review the "lawfulness" of a "removal-related action because such claims are 'collateral' to the discretionary decisions immunized by section 1252(g)." *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 376 (D. Mass. 2025) (citing *Kong v. United States,* 62 F.4th 608, 617 (1st Cir. 2023). Although the Sixth Circuit has not directly weighed in on this issue, multiple other Circuit Courts have and have all found that trial courts retain jurisdiction. *See United States v. Hovespian,* 359 F.3d 1144, 1155 (9th Cir. 2004); *Madu v. U.S. Att'y Gen.,* 470 F.3d 1362, 1368 (11th Cir. 2006); *Borwin v. U.S. INS,* 194 F.3d 483, 488 (4th Cir. 1999). As in *D.V.D.*, Diaz is *not* challenging the decision to execute a final order of removal against her, even to the DRC. Nor is she challenging her removability at large. Instead, Diaz is challenging Defendants' "designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent[ing] [Diaz's] due-process rights and the carefully crafted scheme that Congress has set forth." *D.V.D.*, 778 F. Supp. 3d at 377. The Court will not "immunize an unlawful practice" of the United States from "judicial review." *Id.* (citing *Bowen v. Mich. Acad. Of Family Physicians*, 476 U.S. 667, 671-72 (1986)). Thus, the Court may "review the purely legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country." *Id.*

## IV.    Jurisdiction

A.    Likelihood of Success on the Merits

Diaz has established that she is likely to succeed in showing that Respondents have not complied with the requirements set forth in 8 U.S.C. § 1231(b) and its implementing regulations. "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). There is a 4-step process for designating countries of removal for those granted withholding of removal or protection under the Convention Against Torture as described in 8 U.S.C. § 1231(b) and *Jama v. Immigr. & Customs Enforc.*, 543 U.S. 335, 338-41 (2005). And further, as held in *Jama*, Congress has established the right to a deferral or withholding of removal pursuant to legitimate fear-based claims. *Id.* (holding that individuals who "face persecution or other mistreatment in the country designated" as their place of removal have multiple "available remedies").

As stated, there is a four-step process for the designation of countries of removal. First, at step one, the noncitizen will be "removed to the country of his choice." *Id.* Second, the IJ, or DHS, may disregard a designation of the noncitizen's choice if the noncitizen "fails to designate a country promptly" or the country is unwilling to take the noncitizen. 8 U.S.C. § 1231(b)(3). Third, the IJ, or DHS, may select an alternative country of removal where the individual is a "subject, national, or citizen" unless that country is unwilling to take the noncitizen. 8 U.S.C. § 1231(b)(2). And the last option for Respondents is outlined in Section 1231(b)(2)(E), titled "Additional removal countries" which reads in full:

> If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

6

(i) The country from which the alien was admitted to the United States.
(ii)  The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.
(iii)  A country in which the alien resided before the alien entered the country from which the alien entered the United States.
(iv)  The country in which the alien was born.
(v)  The country that had sovereignty over the alien's birthplace when the alien was born.
(vi)  The country in which the alien's birthplace is located when the alien is ordered removed.
(vii)  If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

Section 1231(b)(2)(E).

If DHS wishes to remove a noncitizen in accordance with Section 1231(b)(2)(E)(vii), DHS must provide evidence to the immigration court that foreign country "will accept" the individual. *El Himri v. Ashcroft,* 378 F.3d 932, 939 (9th Cir. 2004). And throughout this process, the noncitizen must be provided with "notice. . . within a reasonable time and in such a manner as will allow [individuals] to actually seek relief" *Trump v. J.G.G.*, 604 U.S. 670 (Apr. 7, 2025) (*per curiam*)*.* This specifically applies to withholding-only relief. *Johnson v. Guzman Chavez*, 594 U.S. 523, 557 (2021) (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . .  withholding only relief); *Noem v. Abrego Garcia, et al.,* 604 U.S. – (2025) (Sotomayor, J., concurring) (holding that the United States has an "obligation to provide [the plaintiff who was subject to an order of removal] ... notice and an opportunity to be heard" and ensure compliance with its "obligations under [CAT]" prior to removal).

Here, only Colombia and Venezuela have been identified in the prior IJ's order as a proper place of removal for Diaz. [DE 18 at 71]. And therefore, Respondents decision to remove Diaz to DRC without proper notice and an opportunity to be heard regarding a fear of persecution of torture in the DRC likely violates her due process rights. *D.V.D.*, 779 F. Supp. At 388. Multiple other

Circuit Courts have held the same. *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998) (failure to provide notice and screening is a "fundamental failure of process"); *Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005) (per curiam) (holding that failure to give "proper notice of a potential country of deportation" may constitute a violation of due process).

Respondents only notice regarding her removal to the DRC appears to be an email from a Chicago based ICO officer which states that Diaz has "been ordered by DC Headquarters removed in a few days to Africa." [DE 18-1 at 77]. And when asked by her counsel for a reasonable fear interview, Respondents stated that "We have diplomatic assurances, and therefore no screening is needed." [DE 18-2 at 82]. It is clear that "diplomatic assurances" about the Diaz's safety on the African continent, (not specifically DRC), is not sufficient to satisfy Diaz's due process rights to be heard prior to deportation to the DRC and does not address "DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory and regulatory framework." *D.V.D.*, 779 F. Supp. at 389 ("[b]lanket diplomatic assurances do not address DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory and regulatory framework"); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999) (holding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence."). Therefore, without "meaningful review" of Diaz's claims, "the rights Congress has provided are little more than dead letter." *D.V.D.*, 779 F. Supp. at 390.

For all these reasons, the Court finds that the first factor supports granting the TRO as Diaz has demonstrated a likelihood of success on the merits.

B.    Irreparable Injury

To show irreparable injury, a movant must show that, absent a TRO, its interests would be damaged in ways that could not be remedied later on in the legal process. *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017). The movant must show that the irreparable harm is "likely," not merely speculative. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20–22 (2008); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) ("[T]he harm alleged must be both certain and immediate, rather than speculative or theoretical.").

In the absence of a TRO, Diaz would be removed from the United States and sent to the DRC in the coming days. [DE 18-1 at 77 (Email from Respondents stating that Petitioner will be "removed in a few days to Africa.")]. Here, the United States is attempting to remove Diaz likely in violation of statute and regulation as discussed above. When this may lead to an illegal deportation of a non-citizen, this constitutes an "immediate and irreparable injury." *Guerrero Lepe v. Andrews et. al.,* 801 F. Supp. 3d 1104, 1119 (E.D. Cal. 2025); *Bautista v. Santacruz*, 2025 WL 2670875, at *8 (C.D. Cal. July 28, 2025). Moreover, when the threatened harm from the removal is "persecution, torture, and death" it is hard to "imagine harm more irreparable." *D.V.D.*, 778 F. Supp. 3d at 391.

Additionally, Diaz was found to be mentally incompetent by an IJ and her counsel was appointed as her qualified representative and guardian. [DE 1 at 5]. The United States is attempting to deport an individual who is determined to be mentally incompetent to a country to which she has no connections or protections without hearing from her guardian or attorney on the issue. Blanket "diplomatic assurances" about her safety aside, there are concerns that without due process there may be immediate and irreparable injury to Diaz as a mentally incompetent individual. *See*

*Mohamed v. TeBrake*, 371 F. Supp. 2d. 1043, 1045 (D. Minn. 2005) ("[t]he law is undeveloped, however, with regard to the particular demands of 'fundamental fairness' in removal proceedings against a potentially incompetent alien.") Here, as stated, an IJ has already found that Diaz has qualified as incompetent. [DE 1 at 5].

For all these reasons, the Court finds that the second factor supports granting the TRO.

### C.  Harm to Others

Under the third factor, courts consider "whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550–51 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754 (6th Cir. 2005)). "While this factor is generally concerned with harm to third parties, courts also often consider the 'balance of hardships' between the parties if an injunction were to issue." *Planned Parenthood Great Nw. Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 599 F. Supp. 3d 497, 508–09 (W.D. Ky. Apr. 21, 2022) (citing *Tenke Corp.*, 511 F.3d at 550–51).

In this case, the granting of a TRO will cause no substantial harm to Respondents. Typical "routine" hearings before immigration judges present "minimal" burdens to the United States. *Hyppolite v. Noem,* 2025 WL 2829511, at *15 (E.D. N.Y. Oct. 6, 2025). And these procedures are already in place. *Id.* Therefore, "existing statutory and regulatory safeguards adequately serve the governmental interest." *Günaydin v. Trump*, 2025 WL 1459154, at *10 (D. Minn. May 21, 2025). Thus, providing Diaz with a fear-based interview prior to her removal will cause no substantial harm to Respondents.

As a result, the Court finds that the third factor weighs in favor of granting the TRO.

10

D.     Public Interest

The public interest also favors granting the TRO because in cases implicating removal "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Still, there is also a "public interest in prompt execution of removal orders." *Id.*

The Supreme Court has consistently held that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama As'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming a preliminary injunction of a wartime President even though his actions were "necessary to avert a national catastrophe"). And it is "always in the public interest to prevent the violation of a party's constitutional rights." *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001)). Here, the Court has stated that the current execution of Diaz's removal order is likely in violation of Section 1231 and its implementing regulations. As the matter currently stands, Diaz has not had a chance to present her reasonable fear of being removed to DRC in front of a neutral fact finder. Only that the United States has "diplomatic assurances" she will be safe. That is not enough. Therefore, the Court finds that these circumstances override Respondents interest in the "prompt execution" of Diaz's removal order. *Nken*, 556 U.S. at 436.

The Court therefore finds that the fourth factor weighs in favor of granting the TRO.

E.     Limitation of Relief

An injunction need only to be as broad as "essential" to "protect. . . rights against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). It will be "irremediable" if Diaz is removed to the DRC in violation of her due process rights.

11

The TRO seeks for Diaz to be "return[ed] to Kentucky" and to not remove her to the DRC until Respondents follow the "procedures outlined in [Section 1231] and [Section 1231]'s regulation[s]." Although the Court cannot order Diaz returned to the Western District of Kentucky, the Court retains jurisdiction over the matter while Diaz remains in the United States. *White v. Lamanna*, 42 F. App'x 670, at *1 (6th Cir. 2002); *See In re Hall*, 988 F.3d 376 (7th Cir. 2021).

Therefore, the Court orders that Respondents must "(1) provide meaningful opportunity for Diaz to raise a fear of return for eligibility for CAT protections; (2) move to reopen the proceedings if Diaz demonstrates 'reasonable fear'; and (3) if Diaz is not found to have demonstrated 'reasonable fear,' provide meaningful opportunity, and a minimum of 15 days, for Diaz to seek to move to reopen immigration proceedings to challenge the potential third-country removal." *D.V.D.,* 778 F. Supp. 3d at 392. These requirements follow the procedure described in is Section 1231(b)(1)-(3) and its implementing regulation found in 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18.

## V.    CONCLUSION

The Court finds that all four factors weigh in favor of granting the TRO. Accordingly, it is **ORDERED** as follows:

(1) Petitioners' Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction [DE 18] is **GRANTED** as to the temporary restraining order;

(2) Respondents **SHALL immediately** provide Petitioner Diaz with:

   a. A meaningful opportunity for Diaz to raise a fear of return for eligibility for Withholding of Removal protections;

   b. Allow Diaz to reopen the proceedings if Diaz demonstrates 'reasonable fear';

12

c. And if Diaz is not found to have demonstrated 'reasonable fear,' provide meaningful opportunity, and a minimum of 14 days, for Diaz to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

(3) Respondents are **ENJOINED** from:

a. Removing Diaz outside the territory of the United States;

b. Removing Diaz to DRC;

(4) The requirement of security under Fed. R. Civ. P. 65(c) is waived due to the strong public interest involved.[1]

(5) The temporary restraining order will expire fourteen (14) days from its entry in accordance with Fed. R. Civ. P. 65(b)(2). Petitioners' counsel is **DIRECTED** to provide a copy of this temporary restraining order onto Respondents.

(6) A preliminary injunction hearing will be scheduled by separate order; if necessary.

**(7) This order is issued April 16, 2026, at 5:00 p.m. Eastern Standard Time.**

Rebecca Grady Jennings, District Judge
United States District Court

April 16, 2026

---

[1] Despite the mandatory language of Fed. R. Civ. P. 65(c), "the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." Appalachian Regional *Healthcare. Inc. v. Coventry Health and Life Ins. Co*., 714 F.3d 424, 431 (6th Cir. 2013)(quoting *Moltan Co. v. Eagle-Picher Indus., Inc*., 55 F.3d 1171, 1176 (6th Cir. 1995)). Given the stage of the proceedings and the strong public interest involved in the issues raised, the Court concludes that requiring security pursuant to Fed. R. Civ. P. 65(c) is not appropriate at this time. *See Moltan*, 55 F.3d at 1176 ("[T]he rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." (citations omitted)).